COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-160-CR

 

 

JOSEPH MARTIN BELSON                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 396TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

                                                    

                                              ------------

                       I.  INTRODUCTION AND PROCEDURAL BACKGROUND








This is Appellant Joseph Martin Belson=s second
appeal.  In his first appeal, this court
reversed Belson=s convictions for two counts of
burglary of a habitation, for which he was sentenced to forty-five years= and
twenty years= confinement, respectively.  We held that double jeopardy barred Belson=s
conviction on the second count and ordered the conviction and sentence on that
count vacated.  We sustained one of
Belson=s issues
challenging his conviction on the first count, reversed the trial court=s
judgment on that count, and remanded the case to the trial court for a new
trial on the first count.  Belson v.
State, No. 02-05-00465-CR, 2006 WL 2925015, at *3 (Tex. App.CFort
Worth Oct. 12, 2006, pet. ref=d) (mem.
op., not designated for publication). 
Upon retrial, the jury found Belson guilty of burglary of a habitation,
and the trial court sentenced him to fifty years=
confinement.

In three points, Belson now appeals that
conviction and sentence, arguing that the evidence is legally and factually
insufficient to support his conviction and that the trial court failed to rebut
a presumption of vindictiveness in sentencing Belson to a higher sentence upon
retrial, fifty years= confinement as opposed to the
forty-five-year sentence imposed in Belson=s first
trial.  We will affirm.

                                    II.  FACTUAL BACKGROUND

A.     Sally Johnson=s[2] Story








Sally testified that on November 2, 2004, around
1:00 a.m., she was asleep in her bedroom when she was awakened by her dog=s
barking and growling.  After
unsuccessfully trying to quiet her dog, Sally noticed a light at the foot of
her bed.  Sally got up to investigate and
encountered Belson in the hallway.  Sally
recognized Belson as a man she had observed walking by her house on a weekly
basis for several months,[3]
but she did not know his name.  Sally
felt A[s]heer
terror, panic@ when she saw who it was; she
knew Belson=s intentions were not good.








Sally testified that Belson told her that he was
not there to hurt her; he was just there to tell her that her front door was
open[4]
and that someone could have come in and raped her.  Sally did not believe that Belson was
genuinely concerned or was there simply to warn her about a danger.  Sally recalled repeating, A[O]kay,
thank you,@ over and over because she was Aabsolutely
terrified@ and knew in her mind that
Belson was there with Avery bad intentions.@  Sally told herself that she would tell Belson
whatever he wanted to hear until she could figure out what she was going to do
to get out of the predicament.

Sally said that Belson was just a few inches from
her face for what felt like an hour. 
While they were in the hallway near the front door, Belson kept
repeating himself, and Sally kept eye contact with him.  Sally tried to move toward the front door,
but Belson had a Avery strong hold@ of her
arm.  As they neared the front door,
Sally saw that it was open a little bit but not enough to get through.

A few feet from the front door, Belson stopped
and asked Sally if she had five minutes to talk.  Sally said, ASure,@ and
asked if they could go outside.  Belson
looked over at the door and Akind of
smiled like there was a possibility of going outside.@  But then he said that it was too cold, he
stopped smiling, and he slammed the door shut. 
Belson blocked in Sally against a wall. 
Sally felt sure Belson was going to rape her; she thought he had been
stalking her for the past six months, walking by her house repeatedly.  She testified that she was scared to death.








While Belson pinned Sally against the wall, he
told her that he had had a sex fantasy dream about her.  Belson said that in his dream he had walked by
Sally=s house
numerous times and saw her door open.  So
according to Belson, the evening=s events
were Adeja vu,@ and he
had entered Sally=s house.

Sally could not remember the exact sequence of
events, but Belson became physically aggressive, grabbing her on her rear end
over her pajama pants and placing his hand on her crotch.  Belson told Sally something to the effect
that, for a woman her age, she still looked pretty good.  Sally felt Belson was going to force her to
have sex with him.  Belson then got down
on his knees in front of her and propositioned Sally for oral sex.  Sally tried to push his head away.








Belson then told Sally that she was going to give
him a Ablow
job,@ which
she did not interpret as a request. 
Belson raised his shirt up; his pants were already undone and were
around his knees, and his penis was exposed and fully erect.  When Belson attempted to stand up, however,
his pants tangled around his knees. 
Sally leaped over him, ran to the phone in the kitchen, and dialed
911.  She yelled at Belson to get out of
her house and told him that she was calling the police.  Belson eventually moved toward the front door
and opened it; Sally charged him, pushed him out, slammed the door, and locked
it.  The police arrived shortly
thereafter.[5]

The back door was open when the police
arrived.  Sally explained that before the
police had arrived, she had let the cat out the back door or opened the door to
see if the cat had gone out.  Sally testified
that Belson did not have a key to her house and that she never gave Belson
permission to enter her house.  Sally
never indicated to Belson that it was permissible for him to perform oral sex
on her or that she would agree to give him oral sex.  Sally gave the police a description of what
Belson was wearing, and the police told Sally to call if she saw Belson again.








The evening after the assault, Belson returned to
Sally=s
house.  Sally was standing in front of
her house talking to her estranged husband. 
Belson told Sally that he had come to check on her to see how she was
doing.  Sally started screaming for
Belson to leave.  As Belson walked toward
Sally, she continued to scream.  Belson=s
demeanor changed, and he asked what the police had told her about him, A[l]ike
they already knew something.@  Sally=s
husband spoke with Belson, and Belson left. 
Sally did not call the police until the next morning.

B.     The Investigation

Officer Christopher Ceballos with the City of
Arlington Police Department was dispatched to Sally=s
residence around 1:00 a.m. on the day of the burglary.  Officer Ceballos checked around the house and
discovered that the back glass door was open; Sally said that she had let her
cat out.  He thought it was odd that Sally
would open the back door but said that Adue to
her state I just don=t think she was really thinking.@  Officer Ceballos found no sign of forced
entry.  He questioned Sally, who was very
upset, and obtained a physical description of the intruder.  His report stated that Belson told Sally, A[P]lease
let me touch you.@








Detective Becky Szatkowski received the case when
she arrived for work on November 2, 2004, and determined that further follow-up
was needed.  Detective Szatkowski went to
Sally=s house
and spoke with her and thereafter called the crime scene unit to look for DNA
evidence and fingerprints at the scene. 
The crime scene investigators collected Sally=s
pajamas, a rug or two,[6]
and fingerprints from the door frame. 
Detective Szatkowski subsequently asked Sally to come to her office
where she showed Sally a photographic line-up, but Sally determined that none
of the photos matched the intruder.

Later, Detective Wade located a photo of Belson,
and both Detective Wade and Detective Szatkowski went to Sally=s house
with a photographic line-up to see if Sally could identify the intruder.  Detective Szatkowski testified that when she
arrived, Sally pointed to the photo of Belson as the person who had been in her
house.

Constance Patton, who is employed as a senior
biologist and DNA technical leader for the Fort Worth Medical Examiner=s
Office, testified that the pair of pajama pants that were tested contained
Sally=s DNA
and had a stain that confirmed the presence of semen; however, Belson was
excluded as the contributor of the semen. 
The pajama top and rugs did not contain any DNA.

Ignacio Acosta, who was formerly a crime scene
investigator and latent print examiner with the Arlington Police Department,
testified that he received a call from Detective Szatkowsi asking him to
process a crime scene.  Acosta lifted two
impressions from the bedroom door frame, and they matched Belson=s
fingerprints.  However, Acosta was not
able to get any prints off the front door or off of a lighter that was found on
a shelf in the entryway.








C.     Belson=s
Testimony

Belson testified at trial and described Sally as
his Abuddy.@  Belson said that he lived near Sally and that
he had met her through one of his friends who lived across the street from
her.  Belson said that Sally had told him
her name one day when he walked by her mailbox and that he had told Sally the
first day he met her that she had a nice figure and was a very attractive
lady.  Belson asked Sally if she lived by
herself, and Sally told him that she had been divorced for five or six years
and that she lived in the house with her son. 
Belson asked Sally if he could come by and speak to her later.  Belson recollected that Sally pointed out her
van and told him that she was normally home after 5:00 p.m. and to come by
then.

On November 2, 2004 after midnight, Belson said
that his girlfriend, Laura, called and said that she could not come over that
night.  Belson said that he could have
gone to her house for a Abooty call@ but
that he was not Ain the mood for anything, not
initially.@ 
Belson testified that later that night he decided to walk to a nearby
convenience store to purchase cigarettes; on his way, he passed Sally=s house
and noticed that the front door was open. 
Belson suspected that Sally=s open
door was a Asetup.@  When asked what he meant by Asetup,@ Belson
said,








I don=t necessarily mean
somebody purposely putting you in a bad predicament.  I mean, a setup as in trouble.  That looks like trouble.  The front door wide open, 1:00 o=clock in the morning,
there=s nobody around.  It=s just front door wide open.

That looks like a threshold of negative stress.  So, you know, I don=t need it.  I already got problems.[7]  All a person got to say is I blinked at them
and I didn=t need that.

 

. . . .

 

Just the whole accusation and the whole, you know, trauma behind what
I=m going through. 

 

Belson said that on his way back from the store he stopped at Sally=s house
and rang the doorbell several times; no one answered, so he walked home.  Belson admitted that although he had seen
Sally=s front
door open both on his way to the store and on his way back home, he did not
call the police when he arrived home because he was trying not to be involved.








Belson claimed he realized when he got home that
the store clerk had not given him his cigarettes, so he left to walk back to
the convenience store.  As he walked by
Sally=s house,
he noted that her front door was still open. 
Belson said that he again rang the doorbell and that this time he
overheard moaning inside.  Belson claimed
that he began yelling into the house and that Sally came to the door.  Belson then stepped inside, though Sally did
not invite him in.  Belson said that when
he crossed the threshold of Sally=s house,[8]
he did not have the intent to have a sexual relationship with Sally.  Belson said that he talked to Sally in the
entryway where the porch light was shining because he wanted to make sure that
she saw exactly who he was.  He gave
Sally his driver=s license,[9]
made sure she was okay, and suggested that she call the police.  Belson said that Sally gave him a hug right
after he had checked to see if she was all right and said that his hand had
accidentally dropped and touched her leg.








Belson asked Sally if there was a possibility
that they could get to know each other better and said that it did not have to
be immediately.  Specifically, Belson
said, A[M]aybe
I=m just
out of line, you know, or, you know, stop me if I=m going
too far, but, you know, I was just wondering, you know, if you and I could
ever, you know, possibly have some kind of relationship.@  Belson testified that he objected to talking
outside where it was cold but said that he offered to leave if he was bothering
Sally.  Belson said that he did not get
the impression that Sally wanted him to leave or was scared of him; Belson said
that Sally never asked him to leave and never acted like she did not want him
there.

According to Belson, when Sally agreed to talk
with Belson for a moment, he believed she wanted to have sex with him.  He told her things that he would say to a
woman that he wanted to have sex with and thought that she seemed
flattered.  Belson testified he requested
that he be permitted to perform oral sex on Sally, kneeled down in front of
her, and claimed that she put her hands on his shoulders but was not pushing
him away.  Belson testified that Sally
told him that right then would not be a good time for that, but he claimed she
never said Ano.@

Belson testified that for thirty to sixty minutes
he and Sally talked; he claimed Ait was
really just me talking to her and explaining to her the deja vu situation.@  Belson initially testified that he had
dreamed about Sally, that it was a sexual dream, and that this was deja
vu.  But later, Belson said that he had a
sexual dream about a woman in that house but that it was not Sally and
that the woman in the dream never actually had sex with him. 








Belson said that eventually he left Sally=s house
on his own; Sally did not push him out of her house.  But later Belson testified that at the Avery,
very end@ of
their conversation, Sally said that he needed to leave or that she would call
the police.

The next evening, Belson stopped and talked to
Sally to make sure that she was okay. 
Belson said that Sally=s
husband talked to him as he was leaving but did not ask him to leave.

The following day, police arrested Belson.  Belson gave police a written statement,
saying that he did not think that he had done anything wrong.

D.     Verdict and Sentence

After hearing the above testimony, the jury found
Belson guilty.  The trial court
thereafter sentenced Belson to fifty years=
imprisonment.

                      III.  SUFFICIENT EVIDENCE TO SUPPORT CONVICTION

In his first and second points, Belson argues
that the evidence is legally and factually insufficient to support his
conviction for burglary of a habitation.

A.     Legal Sufficiency Standard

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).








This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008). 
Thus, when performing a legal sufficiency review, we may not re-evaluate
the weight and credibility of the evidence and substitute our judgment for that
of the factfinder.  Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.








The sufficiency of the evidence should be
measured by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  Grotti
v. State, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008); Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  Such a charge would be one that accurately
sets out the law, is authorized by the indictment, does not unnecessarily
restrict the State=s theories of liability, and
adequately describes the particular offense for which the defendant was
tried.  Gollihar v. State, 46
S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953 S.W.2d at 240.  However, we may not affirm a conviction based
on legal or factual grounds that were not submitted to the jury.  Malik, 953 S.W.2d at 238 n.3.  The law as authorized by the indictment means
the statutory elements of the charged offense as modified by the charging
instrument.  See Curry v. State,
30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The standard of review is the same for direct and
circumstantial evidence cases; circumstantial evidence is as probative as
direct evidence in establishing the guilt of an actor.  Clayton, 235 S.W.3d at 778; Hooper,
214 S.W.3d at 13.  In determining the
legal sufficiency of the evidence to show an appellant=s
intent, and faced with a record that supports conflicting inferences, we Amust
presumeCeven if
it does not affirmatively appear in the recordCthat the
trier of fact resolved any such conflict in favor of the prosecution, and must
defer to that resolution.@ 
Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).








B.     Factual Sufficiency Standard

When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129
S. Ct. 1037 (2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).  Unless the record clearly
reveals that a different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, unless we conclude that it is necessary
to correct manifest injustice, we must give due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Id. at 9.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon, 253 S.W.3d at 704.

An opinion addressing factual sufficiency must
include a discussion of the most important and relevant evidence that supports
the appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  Moreover, an
opinion reversing and remanding on factual insufficiency grounds must detail
all the evidence and clearly state why the finding in question is factually
insufficient and under which ground.  Goodman
v. State, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23
S.W.3d at 7.








C.     Law

A person commits burglary if, without the
effective consent of the owner, he enters a habitation with the intent to
commit a felony, theft, or an assault. 
Tex. Penal Code Ann. ' 30.02(a)(1)
(Vernon 2003).  A person commits the
offense of sexual assault if he intentionally or knowingly Acauses
the penetration of the anus or sexual organ of another person by any means,
without that person=s consent; causes the
penetration of the mouth of another person by the sexual organ of the actor,
without that person=s consent; or causes the sexual
organ of another person, without that person=s
consent, to contact or penetrate the mouth, anus, or sexual organ of another
person, including the actor.@  Tex. Penal Code Ann. '
22.011(a)B(c) (Vernon Supp. 2008).








Intent is an essential element of the offense of
burglary, which the State must prove beyond a reasonable doubt.  LaPoint v. State, 750 S.W.2d 180, 182
(Tex. Crim. App. 1986); Coleman v. State, 832 S.W.2d 409, 413 (Tex. App.CHouston
[1st Dist.] 1992, pet. ref=d).  A defendant=s intent
to commit a felony must exist at the time of and accompany the entry into the
habitation.  Conrad v. State, 154
Tex. Crim. 624, 626, 230 S.W.2d 225, 226 (1950).  The jury is exclusively empowered to
determine the issue of intent, and the events of a burglary may imply the
intent with which the burglar entered.  Coleman,
832 S.W.2d at 413.  A defendant=s intent
to commit an offense may be inferred from his acts, words, and conduct.  Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002).

D.     Legally Sufficient Evidence

Here, the indictment charged Belson with
intentionally or knowingly, without the effective consent of the owner,
entering a habitation with intent to commit sexual assault.  The record reveals that Belson admitted that
Sally did not consent to his entry. 
Thus, the crux of Belson=s legal
sufficiency argument focuses not on the entering-a-habitation prong of the
offense but on the with-intent-to-commit-sexual-assault prong of the burglary
charge as alleged in the indictment. 
Specifically, Belson argues that there was no conclusive testimony that
he either entered Sally=s home with the intent to commit
sexual assault or that he attempted to commit sexual assault when he was
inside.








The jury heard evidence that for approximately
six months prior to the burglary, Sally saw Belson appear outside her house
when she arrived home from work; Belson would stare at her.  The first time Sally noticed Belson walking
by her mailbox, Belson told her that she had a nice figure and asked if she
lived alone.  On the night in question,
Belson saw Sally=s open door and testified that
it looked like trouble but that he did not call the police; instead, he went
inside and told Sally that someone could have raped her.  Belson told Sally how this was deja vu
because he had a sexual fantasy dream about Sally in which he had oral sex with
her.  Sally testified that during the
burglary Belson grabbed her crotch, told her she looked good for her age,
grabbed her arm, pinned her against a wall, got down on his knees, solicited
oral sex, and showed Sally his erect penis. 
Sally identified Belson in a photographic line-up, and the physical
evidence revealed Belson=s fingerprints matched those
lifted from Sally=s bedroom door frame.








Having reviewed the evidence in the light most
favorable to the jury=s verdict, we hold that there is
legally sufficient evidence from which the jury could have reasonably inferred
that Belson intended to sexually assault Sally when he entered her home without
her consent.  See Caballero v. State,
No. 04-08-00278-CR, 2009 WL 962462, at *3 (Tex. App.CSan
Antonio Apr. 8, 2009, no pet. h.) (mem. op.) (holding legally sufficient
evidence existed that appellant intended to sexually assault victim when
appellant had been seen around victim=s house
on multiple occasions, entered victim=s
residence at nighttime with two bottles of champagne, locked the doors, armed
himself with a kitchen knife, grabbed the victim and asked her to have a drink
with him, and tried to stop victim from escaping); Davis v. State, No.
02-02-00497-CR, 2004 WL 914987, at *4B5 (Tex.
App.CFort
Worth Apr. 29, 2004, no pet.) (mem. op., not designated for publication)
(holding legally sufficient evidence existed to support intent element of
conviction for burglary of a habitation with intent to commit sexual assault).

E.     Factually Sufficient Evidence

Under his factual sufficiency analysis, Belson
argues that he had permission to come by Sally=s house,
that the door was open, and that the DNA evidence excluded Belson.  With regard to the entering-a-habitation
prong of the offense, the jury had before it Sally=s
testimony that she had never given Belson a key or permission to come into her
house, as well as Belson=s testimony that Sally did not
invite him into her house on the night in question but had previously told him
that she was normally home after 5:00 and that he could come by then.








With regard to the
with-intent-to-commit-sexual-assault prong, the jury had before it testimony
from Belson that he had a girlfriend; that he stood in the light and gave Sally
his driver=s license so that she would see
who was in her house; that he did not have the intent to commit sexual assault
when he crossed the threshold of Sally=s house;
that when he told her things that he would say to a woman that he wanted to
have sex with, she seemed flattered; that he never asked Sally to perform oral
sex on him; that he never exposed himself to her; that he never dropped his
pants; that he never asked her if she wanted to have sex; that he never said
that he wanted to have sex with her; that he never physically or verbally
forced Sally to do anything; that he never grabbed Sally=s
crotch; and that he never forced his hands or any part of his body onto
Sally.  The record also revealed (1) that
Belson argued it did not make sense for him to leave fingerprints in Sally=s house
and then tell her to call the police, and (2) that Sally failed to call the
police back after she thought her initial phone call did not go through and
waited one day before calling the police after Belson=s return
visit to her house.








The jury also had before it all of Sally=s
testimony detailing Belson=s sexual
advances, which directly contradicted Belson=s
testimony, as well as physical evidence that Belson=s
fingerprints matched those that were lifted from Sally=s
bedroom doorway but that he had been excluded as the contributor of the sample
of semen found on Sally=s pajamas.  Viewing the evidence in a neutral light, we
cannot conclude that the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon, 253 S.W.3d at
704; Watson, 204 S.W.3d at 414B15,
417.  Assuming the jury chose to believe
Sally=s
version of the events, the jury could have reasonably inferred from Belson=s
actions that he had entered Sally=s home
without her consent and with the intent to sexually assault her.  We therefore hold that the evidence is
factually sufficient to support Belson=s
conviction.  See Caballero,
2009 WL 962462, at *3; Davis, 2004 WL 914987, at *4B5; Granados
v. State, No. 02-03-00082-CR, 2004 WL 742936, at *4B5 (Tex.
App.CFort
Worth 2004, no pet.) (mem. op., not designated for publication) (holding
evidence factually sufficient to prove appellant intended to commit sexual
assault when he entered apartment).  We
overrule Belson=s first and second points.

                        IV.  REBUTTED PRESUMPTION
OF VINDICTIVENESS

In his third point, Belson complains that the
trial court sentenced him to a higher sentence on retrial without just cause
and without rebutting the presumption of vindictiveness.  Specifically, Belson relies on North
Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072 (1969), arguing that the
trial court improperly increased his sentence on retrial even though there was
no justification for doing so.








The court in Pearce held that whenever a
judge imposes a more severe sentence upon a defendant whose original conviction
was set aside at his own behest, the judge=s
reasons for doing so must appear on the record. 
Id. at 726, 89 S. Ct. at 2081. 
The reasons for the increased sentence must be based upon objective
information concerning identifiable conduct on the part of the defendant
occurring after the time of the original sentencing; in addition, the factual
data upon which the increased sentence is based must be made part of the record
so that the increased sentence may be fully reviewed on appeal.  Id., 89 S. Ct. at 2081.  The court held this prevents vindictiveness
on the part of the trial court, as due process requires that vindictiveness
against a defendant for having successfully attacked his first conviction play
no part in the sentence he receives after a new trial.  Id. at 725, 89 S. Ct. at 2080.

In some instances, the appellant is entitled to a
presumption of vindictiveness, and therefore the rule in Pearce
automatically applies.  See U.S. v.
Goodwin, 457 U.S. 368, 373, 102 S. Ct. 2485, 2488 (1982).  However, in a subsequent opinion the Supreme
Court held the following:

While the Pearce
opinion appeared on its face to announce a rule of sweeping dimension, our
subsequent cases have made clear that its presumption of vindictiveness Ado[es] not apply in every
case where a convicted defendant receives a higher sentence on retrial.@  As we explained in Texas v. McCullough,
Athe evil the [Pearce]
Court sought to prevent@ was not the imposition
of Aenlarged sentences after
a new trial@ but Avindictiveness of a
sentencing judge.@  Because the Pearce presumption Amay operate in the
absence of any proof of an improper motive and thus . . . block a legitimate
response to criminal conduct,@ we have limited its application, like that of Aother >judicially created means
of effectuating the rights secured by the [Constitution],=@ to circumstances Awhere its >objectives are thought
most efficaciously served.=A  Such
circumstances are those in which there is a Areasonable likelihood@ that the increase in
sentence is the product of actual vindictiveness on the part of the sentencing
authority.  Where there is no such
reasonable likelihood, the burden remains upon the defendant to prove actual
vindictiveness.








Alabama v. Smith, 490 U.S. 794, 799B800, 109
S. Ct. 2201, 2204B05 (1989) (internal citations
omitted).  Thus, a party is entitled to a
presumption of vindictiveness (thus invoking the Pearce rule) unless the
State can show, based on the record, that there is no reasonable likelihood of
vindictiveness.  Jimenez v. State,
No. 04-08-00121-CR, 2009 WL 700655, at *5 (Tex. App.CSan
Antonio Mar. 18, 2009, no pet. h.)  If
the State shows no reasonable likelihood of vindictiveness, the presumption is
rebutted and the Pearce rule does not apply; however, the defendant may
still obtain relief through a showing of actual vindictiveness upon
resentencing.  Id.

In this case, the same judge presided over both
trials.  After the first trial, Belson
was sentenced to forty-five years=
confinement on the first count of his indictment.  At the conclusion of the second trial, again
on the first count of his indictment, the trial court sentenced Belson to fifty
years=
confinement.  After the trial court
imposed the fifty-year sentence, the following occurred on the record:

[APPELLANT=S COUNSEL]:  Judge, I have one objection to the Court=s sentence.

 

THE COURT:  Go ahead.

 








[APPELLANT=S COUNSEL]:  I would ask the Court [to] reconsider and
sentence the Defendant to no more than 45 years, which is the sentence he
previously received from the Court, and I would submit to the Court that there=s been no material change
in the testimony in this case that would substantiate that.

 

THE COURT:  The Court bases its
ruling upon the testimony and the behavior of the Defendant both throughout the
trial as well as his demeanor while testifying in court, and the Court finds
that the punishment range is within -- the punishment assessed is within the
statute allowed -- the punishment range allowed by statute, and that is what I=m basing my decision on,
as well as the totality of the evidence that was submitted at trial. 

 








As demonstrated by the record, the trial court
pointed to Belson=s behavior and demeanor at the
second trial as the reason for the five-year increase in his sentence.  We hold that because the objective reasons
affirmatively appear on the record for the trial court=s
decision to sentence Belson to five additional years=
confinement, there is no reasonable likelihood of vindictiveness.  See, e.g., Smith, 490 U.S. at 801, 109
S. Ct. at 2206 (recognizing valid basis for increase in sentence on retrial to
be Adefendant=s
conduct during trial may give the judge insights into [defendant=s] moral
character and suitability for rehabilitation@); Amaya
v. State, 759 S.W.2d 737, 740 (Tex. App.CEl Paso
1988, pet. ref=d) (recognizing valid basis for
increase in sentence on retrial Awould
arise where the second, post-appeal evidentiary presentation . . . cast the
defendant . . . in a much more unfavorable lightA); see
Jiminez, 2009 WL 700655, at *5B6
(holding no Areasonable likelihood@ of
vindictiveness existed when trial court had granted defendant=s motion
for new trial); Webb v. State, No. 13-03-00041-CR, 2006 WL 3525427, at
*6 (Tex. App.CCorpus Christi Dec. 7, 2006,
pet. ref=d) (mem.
op., not designated for publication) (holding any presumption of vindictiveness
was rebutted when trial court stated on the record that there was Aa
substantial difference in the evidence presented@).  Belson points to no actual evidence of
vindictiveness.  We therefore overrule
his third point.

                                          V.  CONCLUSION

Having overruled all three of Belson=s
points, we affirm the trial court=s
judgment.

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT, WALKER,
and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  May 28, 2009











[1]See Tex. R. App. P. 47.4.





[2]This is a pseudonym given
to the victim at the outset of the police investigation and used throughout the
trial.





[3]Sally said that she got
off work some days around 2:00 p.m. and found it strange that Belson always
happened to be coming by her house at that exact time.  As she would walk to her mailbox, he would
pass her and then stop and stare at her. 
As she would walk off, he would turn around and stop and stare
again.  Sally said that Belson=s blank stares made her
very uncomfortable.  In order to break
the uncomfortableness, Sally testified that she would say, A[H]ey, how=s it going?@ but Belson would just
continue to stare at her.





[4]Sally could not
specifically recall locking the door that night but said that it was her habit
to lock the door.  She did not believe
that her front door had been left open because it would have been cold in her
house and, based on past experience, her dog would have gone outside.  She said that her front door had never
spontaneously opened and that although the lock on the front door had stopped
working about a week before the incident, it had been repaired.

 

Robin
Roberts, who stayed in Sally=s home from early September 2004 through the end
of October 2004, testified that in late October she had noticed that Sally=s front door had stopped
functioning properly.  Roberts saw that
the weather stripping had been Arubbed down, jostled[,] or something@ and that the doorknob
could be turned without engaging the locking mechanism.  Roberts thought that the lock had been
tampered with and told Sally about the problem. 
Sally had the lock repaired that same evening.  After the lock was repaired, Roberts did not
notice any other problems with the door.





[5]Sally had not been able
to talk to the 911 operator because her phone=s battery was low, so
until the police arrived, she did not know that her call to 911 had gone
through.





[6]While police were at
Sally=s house, her dog began
scratching on the rug, and Sally said that her dog had never scratched at the
rug before.  Detective Szatkowski thought
that there might be evidence on the rug that was alerting the dog.





[7]Belson admitted that he
had been convicted of indecent exposure on June 7, 1996; on October 11, 1996;
and on September 8, 1997.  Belson also
admitted that on October 26, 1998, he had been convicted of the felony offense
of failure to register as a sex offender.





[8]Belson testified that he
never went beyond the entryway, that he never touched the doorway where the
fingerprints were obtained, that he never went into Sally=s bedroom, and that the
lighter that police found was not his.





[9]Sally testified that she
did not recall that Belson showed her his driver=s license until the
police told her that she had said that.